IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-401

No. COA20-594

Filed 3 August 2021

Wake County, No. 17 CVD 4251

MICHAEL PUTNAM, Plaintiff,

v.

REBECCA PUTNAM, Defendant.

Appeal by Defendant from order entered 11 February 2020 by Judge Christine Walczyk in Wake County District Court. Heard in the Court of Appeals 25 May 2021.

*Marshall & Taylor, PLLC, by Travis R. Taylor for plaintiff-appellee.*

*Gailor Hunt Davis Taylor & Gibbs, PLLC, by Jonathan S. Melton and Carrie B. Tortora for defendant-appellant.*

MURPHY, Judge.

¶ 1        Decisions regarding the determination and amount of alimony are left to the sound discretion of the trial court. A trial court does not abuse its discretion when it considers all relevant factors under N.C.G.S. § 50-16.3A(b) for which evidence is offered. Here, the Record reflects the trial court considered all relevant factors under N.C.G.S. § 50-16.3A(b), including the parties' standard of living during the marriage, and did not abuse its discretion in determining the dependent spouse is entitled to $2,100.00 per month in alimony.

## BACKGROUND

Plaintiff Michael Putnam ("Michael") and Defendant Rebecca Putnam ("Rebecca") were married on 16 June 2001. On 2 March 2017, Michael and Rebecca separated, and on 27 July 2018, they divorced. Michael and Rebecca are the parents of three minor children.

After the parties separated, they resolved equitable distribution by entering into a consent order, filed 21 May 2018, regarding the distribution of their property. As a result of the consent order, Michael was awarded Sequence, Inc. ("Sequence"), a validation specialist company Michael and Rebecca formed in 2002, in which Rebecca had been a 51% shareholder and Michael had been a 49% shareholder. According to the terms of the consent order, Michael became the 100% shareholder in Sequence. Rebecca received a distributive award of approximately $3,000,000.00 in exchange for Michael retaining Sequence, as well as a payout of $225,000.00 in exchange for Michael retaining the parties' beach house purchased during the marriage. The consent order did not resolve the issue of alimony.

On 11 February 2020, after an alimony trial, the trial court entered its *Order on Alimony, Temporary Child Support and Attorney's Fees* ("Alimony Order"). The Alimony Order designated Michael as the supporting spouse and Rebecca as the dependent spouse, and ordered Michael to pay Rebecca $2,100.00 per month in alimony, $1,900.00 per month in temporary child support, and $72,617.00 in support

arrears at the rate of $1,500.00 per month.  Rebecca timely appeals, arguing the trial court erred in its computation and award of alimony.[1]

## **ANALYSIS**

¶ 5     Rebecca argues the Alimony Order should be vacated "as to the amount of [her] reasonable monthly needs and remand[ed] for entry of a new order."  Rebecca also argues "the trial court abused its discretion in the amount of alimony awarded to [her]."

¶ 6     "Decisions regarding the amount of alimony are left to the sound discretion of the trial judge and will not be disturbed on appeal unless there has been a manifest abuse of that discretion." *Bookholt v. Bookholt*, 136 N.C. App. 247, 249-50, 523 S.E.2d 729, 731 (1999), *superseded on other grounds by statute as stated in Williamson v. Williamson*, 142 N.C. App. 702, 543 S.E.2d 897 (2001).  Our review of the trial court's findings of fact is limited to "whether there is competent evidence to support the findings of fact and whether the findings support the conclusions of law." *Hartsell v.*

---

[1] In accordance with N.C.G.S. § 50-16.3A(a), "[t]he [trial] court shall award alimony to the dependent spouse upon a finding that one spouse is a dependent spouse, that the other spouse is a supporting spouse, and that an award of alimony is equitable after considering all relevant factors, including those" listed in N.C.G.S. § 50-16.3A(b).  N.C.G.S. § 50-16.3A(a) (2019).  Rebecca does not argue the trial court erred in finding Michael to be a supporting spouse and finding her to be a dependent spouse.  Rather, Rebecca argues the trial court's procedure in computing her alimony award was error and challenges the amount of her alimony award.

*Hartsell*, 99 N.C. App. 380, 385, 393 S.E.2d 570, 573 (1990), *aff'd*, 328 N.C. 729, 403 S.E.2d 307 (1991).

### A. Reasonable Monthly Expenses

¶ 7    In her most updated amended financial affidavit, dated 10 June 2019, Rebecca listed her total monthly expenses, including the children's expenses, as $18,275.71. The trial court concluded that some of these expenses were unreasonable, and without making any further findings of fact, reduced this number by approximately $4,600.00, finding "[Rebecca's] reasonable monthly expenses, *given the standard of living during the marriage of the parties*, are $13,677.56. This includes the children's monthly expenses." (Emphasis added).

¶ 8    N.C.G.S. § 50-16.3A(b) permits the trial court to exercise its discretion in determining the amount of alimony and directs the trial court to "consider all relevant factors" when making the determination of alimony, including "[t]he standard of living of the spouses established during the marriage[.]" N.C.G.S. § 50-16.3A(b)(8) (2019). Our Supreme Court has defined the phrase "standard of living" as used in N.C.G.S. § 50-16.3A(b)(8) as follows:

> The . . . phrase clearly means more than a level of mere economic survival. Plainly, in our view, it contemplates the economic standard established by the marital partnership for the family unit during the years the marital contract was intact. It anticipates that alimony, to the extent it can possibly do so, shall sustain that standard of living for the dependent spouse to which the parties together became

accustomed.

*Williams v. Williams*, 299 N.C. 174, 181, 261 S.E.2d 849, 855 (1980).

¶ 9     Rebecca argues "the trial court failed to consider the parties' standard of living established during the marriage in determining [her] reasonable monthly expenses" as required by N.C.G.S. § 50-16.3A(b)(8). Specifically, Rebecca challenges a portion of Finding of Fact 57 that states the trial court relied on "the standard of living during the marriage of the parties" in calculating her reasonable monthly expenses.

¶ 10    There are numerous findings of fact in the Record that show the trial court considered the parties' standard of living during their marriage, including the following:

> 17.     *During the marriage of the parties*, [Rebecca] was the primary caretaker for the minor children. Except as a substitute teacher on occasion at her children's school, Envision Science Academy, [Rebecca] did not work outside the home after the birth of the first child.
>
> 18.     After the parties' separation, in October 2017 [Rebecca] began working as a preschool teacher at Good Shephard Lutheran Church. [Rebecca] typically works Tuesday through Friday from 9:30 a.m. until 1:30 p.m. This allows her to be home with the children after school.
>
> 19.     [Rebecca] is currently only working part-time. If [Rebecca] were to work a full-time job, she would require childcare assistance before and after school.
>
> . . . .
>
> 23.     After the parties separated, they reached an agreement regarding the distribution of their property in

May 2018. As a result of this Consent Order, [Michael] was awarded the Sequence business, and [Rebecca] received approximately $3,000,000[.00] which she was able to invest. She also received a payout of $225,000[.00] for the Beach House, which house was kept by [Michael].

24. The parties sold their marital residence and [Rebecca] received approximately $300,000[.00] from the proceeds.

25. [Rebecca] prepared and submitted a Financial Affidavit. The affidavit was completed in June 2019.

. . . .

49. On her Financial Affidavit, [Rebecca] reported regular recurring monthly expenses of $16,164.09 at the time the parties separated. She reported current (as of June 2019) regular recurring monthly expenses of $10,036.66 but [Rebecca] testified that her current expenses are $10,222.73 as of the date of this hearing.

50. [Rebecca] also listed on her Financial Affidavit additional individual monthly expenses of $10,005.38 at the date of separation. She listed her current (as of June 2019) individual expenses as $9,198.31. [Rebecca] testified at this hearing that her individual monthly expenses had been reduced to $8,052.98.

. . . .

52. In July 2018, [Rebecca] bought a 2[,]500 square foot townhome on Fawn Lake Drive. She used $395,000[.00] to purchase this townhome and did so without a mortgage. This home was in the same district as her children's schools.

53. Just prior to this trial, in July 2019, [Rebecca] bought a new 4[,]200 square foot home for approximately $720,000[.00]. This home is in a gated community near the

former marital residence and is in the same school district as the parties' minor children's schools. [Rebecca] put no money down and secured an equity line to finance the home, using her investment account as collateral. Her monthly payment is $3,131[.00] per month. This mortgage payment amount does not include monthly homeowner's association dues ($83.00), utilities, yard maintenance ($225[.00]) property taxes ($524.66), and insurance costs ($243.00) associated with the property.

. . . .

55.     [Rebecca] purchased a 2019 GMC Yukon in October 2018 and [Rebecca's] automobile loan payment is $1,184[.00] per month. [Rebecca] listed $376[.00] per month for auto repairs and maintenance relating to her new vehicle.

. . . .

58.     [Rebecca] will have an average monthly shortfall of $2,930.00 per month without any consideration for taxes. This is based on income in the amount of $10,746.58 per month and expenses of $13,677.56 per month.

. . . .

62.     *During their marriage*, the parties owned a business, Sequence, [] a validation specialist company which assists pharmaceutical companies in testing equipment. [Michael] began the company in 2002. [Rebecca] was a 51% owner of the company. She assisted with bookkeeping and performed other tasks for the business until 2016.

63.     *During their marriage*, the parties used income from Sequence[] to pay personal expenses, such as automobile loan payments and insurance. *The parties were able to live an extravagant lifestyle during their marriage*. They vacationed frequently and owned a nice home.

. . . .

66.     Some of [Michael's] personal expenses, such as his Ford Expedition, his car insurance and his cell phone are paid by Sequence[].

. . . .

71.     After the parties' separation, [Michael] lived briefly with his sister, and then rented an apartment.  In April 2018, [Michael] purchased a home on Rosalee [sic] Street in Raleigh, North Carolina where he currently resides.

72.     [Michael] completed and served a Financial Affidavit in June 2019 and said Affidavit was admitted at trial.

73.     Sequence[] currently pays for [Michael's] health and dental insurance.    [Michael] pays for the children's medical, dental, and vision insurance at a cost of $398[.00] per month.

74.     On his Financial Affidavit, [Michael] listed regular recurring monthly expenses as of the date of separation in the amount of $16,353[.00].    In addition to his loan repayment and his court-ordered support payment, he listed his current (as of June 2019) regular monthly expenses in the amount of $13,219[.00].

75.     [Michael] reported $12,842[.00] per month in individual monthly expenses at the time of separation and [Michael] reported current (as of June 2019) individual expenses in the amount of $14,197[.00] per month (note: the totals were lower on [Michael's] Financial Affidavit, but these are accurate calculations).

(Emphases added).

Finding of Fact 63 states "[t]he parties were able to live an extravagant lifestyle during their marriage." This finding of fact is unchallenged by Rebecca.[2] The remainder of the findings of fact listed above discuss how Rebecca was able to stay home with the children during the marriage, the types of cars the parties purchased during the marriage, and the size of the houses the parties lived in during the marriage. The trial court also made findings of fact about how Rebecca will continue to stay at home with the children, maintain the same kinds of cars, and live in houses of a similar size, as during the marriage. The trial court properly considered the parties' standard of living during their marriage when it calculated Rebecca's reasonable monthly expenses. *See Barrett v. Barrett*, 140 N.C. App. 369, 372, 536 S.E.2d 642, 645 (2000) (holding the trial court considered the parties' marital standard of living when it "made explicit findings as to the parties' respective incomes during the marriage, the type of home in which they lived, and the types of family vacations they enjoyed"); *see also Adams v. Adams*, 92 N.C. App. 274, 279-80, 374 S.E.2d 450, 453 (1988) ("The [trial] judge's findings as to [the defendant's] monthly gross income and his reasonable living expenses, coupled with the findings as to [the plaintiff's] monthly income and her expenses during the last year of the marriage,

---

[2] As Rebecca does not challenge this finding of fact, it is binding on appeal. *See Juhnn v. Juhnn*, 242 N.C. App. 58, 63, 775 S.E.2d 310, 313 (2015) ("[W]here a trial court's findings of fact are not challenged on appeal, they are deemed to be supported by competent evidence and are binding on appeal.").

satisfied the requirement . . . for findings regarding the [parties'] accustomed standard of living [during the marriage].”), *superseded on other grounds by statute as stated in Brannock v. Brannock*, 135 N.C. App. 635, 523 S.E.2d 110 (1999).

¶ 12    Rebecca also notes that Michael was continuing to save and invest for retirement and contends the parties had a pattern of saving during the marriage. Michael's financial affidavit shows he was investing $1,590.00 per month during the marriage and he was investing $1,661.00 per month at the time of trial. Rebecca was unemployed after the children were born, so her accumulation of retirement assets during the marriage was based solely on Michael's contributions. Rebecca argues "although the trial court made an evidentiary finding regarding [Michael's] saving for retirement, the [trial] court made no ultimate finding regarding [a] pattern of savings as part of the accustomed standard of living for purposes of alimony." We disagree.

¶ 13    "Where the parties have established a pattern of saving for retirement as part of their accustomed standard of living during the marriage, this expense can be part of the standard of living and should be considered for purposes of alimony." *Myers v. Myers*, 269 N.C. App. 237, 262, 837 S.E.2d 443, 460 (2020). "[A]lthough the parties' pattern of savings may not be determinative of a claim for alimony, the trial court must at least consider this pattern in determining the parties' accustomed standard of living." *Vadala v. Vadala*, 145 N.C. App. 478, 481, 550 S.E.2d 536, 539 (2001).

¶ 14        The trial court properly considered the parties' pattern of saving as part of their accustomed standard of living during the marriage, as illustrated in unchallenged Findings of Fact 23, 28, 29, 30, and 42. Those findings of fact state:

> 23.      After the parties separated, they reached an agreement regarding the distribution of their property in May 2018. As a result of this Consent Order, [Michael] was awarded the Sequence business, and [Rebecca] received approximately $3,000,000[.00] which she was able to invest. She also received a payout of $225,000[.00] for the Beach House, which house was kept by [Michael].
>
> . . . .
>
> 28.      Johnathan Henry is a wealth advisor with the Trust Company of the South. He has been assisting [Rebecca] with her investments since June 2018 when she initially deposited the funds from her distributive award.
>
> 29.      Mr. Henry helped [Rebecca] invest her portfolio with a "balanced growth" approach. [Rebecca] currently has an investment portfolio consisting of approximately seventy percent (70%) stocks and thirty percent (30%) bonds. . . .
>
> 30.      In June 2019, [Rebecca's] investment account held $2,506,847.63. [Rebecca] earned $26,914.81 in dividends and interest between January and June 2019. Her capital appreciation was $175,595.20. [Rebecca] paid $9,772.32 in fees and took $188,420[.00] in distributions. She also deposited $202,532.60 during the same period.
>
> . . . .
>
> 42.      The [trial] [c]ourt finds that [Rebecca] can safely withdraw $10,000[.00] per month from the proceeds of her investment account without depleting her estate.

The trial court determined Rebecca has the ability to save for retirement to the same standard that the parties planned for during the marriage by using her investment account. Rebecca does not contest these findings of fact. The trial court properly considered the parties' pattern of savings and retirement contributions as it pertains to the parties' accustomed standard of living.

¶ 15    In further arguing the trial court did not properly consider her reasonable monthly expenses, Rebecca challenges Finding of Fact 56, arguing it is insufficient because it is "vague and does not enable this Court to determine which expenses the trial court reduced."

¶ 16    Finding of Fact 56 states:

> 56.    [Rebecca] included some expenses on her affidavit which she testified she is no longer paying, such as storage unit fees, social memberships, and a life coach. She also listed expenses that she did not include in her total such as charitable giving. [Rebecca] listed other expenses that were not reasonable given the standard of living during the marriage, such as the eating out expenses which increased after separation, or were non-recurring.

¶ 17    The amount the trial court found as Rebecca's reasonable monthly expenses, $13,677.56, differed from the amount Rebecca listed as current monthly expenses as of the date of trial in her amended financial affidavit, $18,275.71. However, "[t]he determination of what constitutes the reasonable needs and expenses of a party in an alimony action is within the discretion of the trial [court], and [it] is not required to

accept at face value the assertion of living expenses offered by the litigants themselves." *Bookholt*, 136 N.C. App. at 250, 523 S.E.2d at 731. "Implicit in this is the idea that the trial judge may resort to his own common sense and every-day experiences in calculating the reasonable needs and expenses of the parties." *Cunningham v. Cunningham*, 171 N.C. App. 550, 564, 615 S.E.2d 675, 685 (2005). "The [trial] court is not required to make findings about the weight and credibility which it gives to the evidence before it." *Robinson v. Robinson*, 210 N.C. App. 319, 327, 707 S.E.2d 785, 791 (2011).

¶ 18        Rebecca suggests the trial court must produce a redline itemization for all reasonable or unreasonable expenses listed on a financial affidavit. This is not what is required of the trial court. In *Bookholt*, we reviewed a defendant's claim that the trial court erred in calculating the monthly needs and expenses of each party:

> In his financial affidavit submitted to the trial court, [the] defendant listed $2[,]100[.00] in projected monthly housing costs to enable him to attain better housing. The trial court, however, considered these projections speculative and reduced this figure to $960.50 in finding [the] defendant's total monthly needs and expenses to be $2[,]823.35. [The] [d]efendant maintains that this amounted to an abuse of the trial judge's discretion. We disagree. . . . Here, the trial court apparently felt the $2[,]100[.00] in projected housing costs was unreasonable and then reduced that figure to an amount it felt was more reasonable. By doing so, we find no abuse in the exercise of its discretion.
>
> [The] [d]efendant also claims error in the trial court's

> calculations as to [the] plaintiff's needs and expenses. In her financial affidavit, [the] plaintiff listed her expenses as $1[,]941.71 per month. The trial judge concluded that five of these expenses were unreasonable and, *without making any further findings*, reduced [the] plaintiff's figure by $625.49. [The] [d]efendant argues that, even though the trial court's reduction ultimately benefitted him, the trial court's calculations are "patently defective" absent appropriate findings to explain them. Again we disagree. As previously stated, the trial judge is not bound by the financial assertions of the parties and may resort to common sense and every-day experiences. By reducing some of [the] plaintiff's expenses here, the trial court did not abuse its discretion.

*Bookholt*, 136 N.C. App. at 250-51, 523 S.E.2d at 731-32 (emphasis added).

¶ 19 Here, as in *Bookholt*, the trial court provided sufficient detail for us to determine it had considered all relevant factors when calculating Rebecca's reasonable monthly needs and expenses. The trial court did not abuse its discretion in reducing Rebecca's monthly expenses and provided sufficient findings of fact for us to review on appeal.

## B. Amount of Alimony Award

¶ 20 Rebecca's second argument pertains to the amount of alimony she was awarded. Rebecca does not take issue with the trial court's finding she is entitled to alimony, but rather takes issue with the *amount* the trial court awarded her in alimony, arguing "the trial court abused its discretion in the amount of alimony awarded to [her]."

"Decisions concerning the amount . . . of alimony are entrusted to the trial court's discretion and will not be disturbed absent a showing that the trial court has abused such discretion." *Robinson*, 210 N.C. App. at 326, 707 S.E.2d at 791; *see also Dodson v. Dodson*, 190 N.C. App. 412, 415, 660 S.E.2d 93, 96 (2008); *Walker v. Walker*, 143 N.C. App. 414, 422, 546 S.E.2d 625, 630 (2001). "The [trial] court is not required to make findings about the weight and credibility which it gives to the evidence before it." *Robinson*, 210 N.C. App. at 327, 707 S.E.2d at 791.

The trial court concluded "[Michael] is a supporting spouse and [Rebecca] is a dependent spouse within the meaning of [N.C.G.S.] § 50-16A." After making that determination, the trial court was required to "consider all relevant factors" in determining the amount and duration of alimony. N.C.G.S. § 50-16.3A(b) (2019). N.C.G.S. § 50-16.3A(b) enumerates sixteen relevant, but non-exclusive factors, including:

> (1) The marital misconduct of either of the spouses. . . .;
>
> (2) The relative earnings and earning capacities of the spouses;
>
> (3) The ages and the physical, mental, and emotional conditions of the spouses;
>
> (4) The amount and sources of earned and unearned income of both spouses, including, but not limited to, earnings, dividends, and benefits such as medical, retirement, insurance, social security, or others;
>
> (5) The duration of the marriage;

(6) The contribution by one spouse to the education, training, or increased earning power of the other spouse;

(7) The extent to which the earning power, expenses, or financial obligations of a spouse will be affected by reason of serving as the custodian of a minor child;

(8) The standard of living of the spouses established during the marriage;

(9) The relative education of the spouses and the time necessary to acquire sufficient education or training to enable the spouse seeking alimony to find employment to meet his or her reasonable economic needs;

(10) The relative assets and liabilities of the spouses and the relative debt service requirements of the spouses, including legal obligations of support;

(11) The property brought to the marriage by either spouse;

(12) The contribution of a spouse as homemaker;

(13) The relative needs of the spouses;

(14) The federal, State, and local tax ramifications of the alimony award;

(15) Any other factor relating to the economic circumstances of the parties that the court finds to be just and proper.

(16) The fact that income received by either party was previously considered by the court in determining the value of a marital or divisible asset in an equitable distribution of the parties' marital or divisible property.

N.C.G.S. § 50-16.3A(b) (2019). "[T]he [trial] court shall make a specific finding of fact on each of the factors [listed above] if evidence is offered on that factor." N.C.G.S. § 50-16.3A(c) (2019).

Here, the trial court made findings of fact reflecting that when the trial court determined the amount of alimony awarded to Rebecca, it considered all the factors for which evidence was offered.

Pursuant to N.C.G.S. § 50-16.3A(b)(1), the trial court considered "marital misconduct of either of the spouses," as illustrated in Findings of Fact 89, 90, 91, 92, and 93:

> 89. The parties had difficulties during their marriage. [Michael] confessed to watching too much pornography. In 2015, [Michael] attended a conference in Minnesota to treat his addiction. He also joined a support group.
>
> 90. Approximately eight months before separation, [Rebecca] moved into the basement and began asking [Michael] to leave the home.
>
> 91. [Michael] then began restricting [Rebecca's] access to company data and he withheld funds from [Rebecca].
>
> 92. [Rebecca] set up a video camera in the home without [Michael's] knowledge and changed the lock on the safety deposit box.
>
> 93. The [trial] [c]ourt does not find that these things rise to the level of marital fault. There was no credible evidence of illicit sexual conduct during the marriage.

*See* N.C.G.S. § 50-16.3A(b)(1) (2019).

Pursuant to N.C.G.S. § 50-16.3A(b)(2), the trial court considered "[t]he relative earnings and earning capacities of the spouses," as illustrated in Findings of Fact 18, 19, 20, 43, and 44:

> 18. After the parties' separation, in October 2017 [] [Rebecca] began working as a preschool teacher at Good Shephard Lutheran Church. [Rebecca] typically works Tuesday through Friday from 9:30 a.m. until 1:30 p.m. This allows her to be home with the children after school.
>
> 19. [Rebecca] is currently only working part-time. If [Rebecca] were to work a full-time job, she would require childcare assistance before and after school.
>
> 20. In 2018 [Rebecca] earned $8,959.39. She is currently working part-time as a preschool teacher.
>
> . . . .
>
> 43. [Rebecca] is currently earning $8,959[.00] per year from her employment. The [trial] [c]ourt cannot find that [Rebecca] is acting in bad faith and will not impute income.
>
> 44. [Rebecca's] monthly income, for purposes of calculating child support and alimony, is $128,959[.00] annually (or $10,748.58 per month).

*See* N.C.G.S. § 50-16.3A(b)(2) (2019).

Pursuant to N.C.G.S. § 50-16.3A(b)(3), the trial court considered "[t]he ages and the physical, mental, and emotional conditions of the spouses," as illustrated in Findings of Fact 84, 95, and 96:

> 84. In determining the amount and duration of alimony, th[e] [trial] [c]ourt has considered, among other things, the duration of the parties['] marriage, the relative

ages and health of the parties, [Rebecca's] role as primary caregiver to the parties' minor children, the financial needs of the parties, the incomes and earnings of the parties, the earning capacities of the parties, and the reasonable expenses of the parties.

. . . .

95.     During the marriage, [Rebecca] had several health conditions, including ADHD, hearing loss, and "XLH." She regularly took medications.

96.     The parties are close in age. [Rebecca] is 45 years old and [Michael] is 43.

*See* N.C.G.S. § 50-16.3A(b)(3) (2019).

¶ 27     Pursuant to N.C.G.S. § 50-16.3A(b)(5), the trial court considered "[t]he duration of the marriage," as illustrated in Findings of Fact 84 and 97:

84.     In determining the amount and duration of alimony, th[e] [trial] [c]ourt has considered, among other things, the duration of the parties['] marriage, the relative ages and health of the parties, [Rebecca's] role as primary caregiver to the parties' minor children, the financial needs of the parties, the incomes and earnings of the parties, the earning capacities of the parties, and the reasonable expenses of the parties.

. . . .

97.     Based on the length of the marriage, the relative age and health of the parties, the age of the children (16, 15, and 12), and the time [Rebecca] needs to re-enter the work force, the [trial] [c]ourt finds that an alimony payment should be made for a period of 6 years.

*See* N.C.G.S. § 50-16.3A(b)(5) (2019).

¶ 28        Pursuant to N.C.G.S. § 50-16.3A(b)(8), the trial court considered "[t]he standard of living of the spouses established during the marriage," as illustrated in Finding of Fact 63:

> 63.      During their marriage, the parties used income from Sequence[] to pay personal expenses, such as automobile loan payments and insurance.  The parties were able to live an extravagant lifestyle during their marriage.   They vacationed frequently and owned a nice home.

*See* N.C.G.S. § 50-16.3A(b)(8) (2019).

¶ 29        Pursuant to N.C.G.S. § 50-16.3A(b)(9), the trial court considered  "[t]he relative education of the spouses and the time necessary to acquire sufficient education or training to enable the spouse seeking alimony to find employment to meet his or her reasonable economic needs," as illustrated in Finding of Fact 84:

> 84.      In  determining  the  amount  and  duration  of alimony, th[e] [trial] [c]ourt has considered, among other things, the duration of the parties['] marriage, the relative ages and health of the parties, [Rebecca's] role as primary caregiver to the parties' minor children, the financial needs of the parties, the incomes and earnings of the parties, the earning capacities of the parties, and the reasonable expenses of the parties.

*See* N.C.G.S. § 50-16.3A(b)(9) (2019).

¶ 30        Pursuant to N.C.G.S. § 50-16.3A(b)(10), the trial court considered "[t]he relative assets and liabilities of the spouses and the relative debt service requirements of the spouses," as illustrated in Findings of Fact 65 and 74:

> 65. In order to buyout [Rebecca's] portion of the business, [Michael] borrowed three million dollars ($3,000,000[.00]) in funds from Sequence[]. Each month, [Michael] is receiving $80,000[.00] in distributions from the company. Of that amount, [Michael] uses $53,906[.00] per month to repay the loan to Sequence, [] leaving him with a net distribution of $26,094[.00] per month. The loan to Sequence will be paid off in June 2023.
>
> . . . .
>
> 74. On his Financial Affidavit, [Michael] listed regular recurring monthly expenses as of the date of separation in the amount of $16,353[.00]. In addition to his loan repayment and his court-ordered support payment, he listed his current (as of June 2019) regular monthly expenses in the amount of $13,219[.00].

*See* N.C.G.S. § 50-16.3A(b)(10) (2019).

Pursuant to N.C.G.S. § 50-16.3A(b)(12), the trial court considered "[t]he contribution of a spouse as homemaker," as illustrated in Finding of Fact 17:

> 17. During the marriage of the parties, [Rebecca] was the primary caretaker for the minor children. Except as a substitute teacher on occasion at her children's school, Envision Science Academy, [Rebecca] did not work outside the home after the birth of the first child.

*See* N.C.G.S. § 50-16.3A(b)(12) (2019).

Pursuant to N.C.G.S. § 50-16.3A(b)(13), the trial court considered "[t]he relative needs of the spouses," as illustrated in Findings of Fact 61 and 84:

> 61. The [trial] [c]ourt finds that [Rebecca's] total monthly need is $4,000[.00] per month.
>
> . . . .

84.     In determining the amount and duration of alimony, th[e] [trial] [c]ourt has considered, among other things, the duration of the parties['] marriage, the relative ages and health of the parties, [Rebecca's] role as primary caregiver to the parties' minor children, the financial needs of the parties, the incomes and earnings of the parties, the earning capacities of the parties, and the reasonable expenses of the parties.

*See* N.C.G.S. § 50-16.3A(b)(13) (2019).

Finally, pursuant to N.C.G.S. § 50-16.3A(b)(16), the trial court considered "[t]he fact that income received by either party was previously considered by the court in determining the value of a marital or divisible asset in an equitable distribution of the parties' marital or divisible property," as illustrated in Findings of Fact 23 and 65:

23.     After the parties separated, they reached an agreement regarding the distribution of their property in May 2018.  As a result of this Consent Order, [Michael] was awarded the Sequence business, and [Rebecca] received approximately $3,000,000[.00] which she was able to invest.  She also received a payout of $225,000[.00] for the Beach House, which house was kept by [Michael].

. . . .

65.     In order to buyout [Rebecca's] portion of the business, [Michael] borrowed three million dollars ($3,000,000[.00]) in funds from Sequence[].  Each month, [Michael] is receiving $80,000[.00] in distributions from the company.  Of that amount, [Michael] uses $53,906[.00] per month to repay the loan to Sequence, [] leaving him with a net distribution of $26,094[.00] per month.  The loan to Sequence will be paid off in June 2023.

*See* N.C.G.S. § 50-16.3A(b)(16) (2019).

The findings of fact listed above are unchallenged and binding on appeal. *Juhnn*, 242 N.C. App. at 63, 775 S.E.2d at 313. No evidence was offered for the remaining factors under N.C.G.S. § 50-16.3A(b)(4), (6), (7), (11), (14), and (15) and the trial court was not required to make findings as to these factors. N.C.G.S. § 50-16.3A(c) (2019). The trial court considered all relevant and required statutory factors in determining the alimony payment to Rebecca and did not abuse its discretion in awarding alimony in the amount of $2,100.00 per month to Rebecca.

## **CONCLUSION**

The trial court did not abuse its discretion in calculating Rebecca's reasonable monthly expenses. Additionally, the trial court did not abuse its discretion in ordering Michael to pay Rebecca $2,100.00 per month in alimony. The *Order on Alimony, Temporary Child Support and Attorney's Fees* is affirmed.

AFFIRMED.

Judges TYSON and JACKSON concur.